UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 18-242 |
| v. | * | SECTION: B |
| CLIFFORD "SKIP" KEEN | * | |

\* \* \*

## FACTUAL BASIS

The defendant, **CLIFFORD "SKIP" KEEN**, (hereinafter, the "defendant" or "**KEEN**"), has agreed to plead guilty as charged to the Bill of Information now pending against him, charging him with conspiracy to commit honest services wire fraud and bribery, in violation of Title 18, United States Code, Sections 371, 1343, 1346, and 666(a)(1)(B). Both the Government and the defendant, **CLIFFORD "SKIP" KEEN**, do hereby stipulate and agree the following facts set forth a sufficient factual basis for the crimes to which the defendant is pleading guilty. The Government and the defendant further stipulate that the Government would have proven, through the introduction of competent testimony and admissible, tangible exhibits, the following facts, beyond a reasonable doubt, to support the allegations in the Bill of Information now pending against the defendant:

### Background

The Government would establish, through the introduction of documentary evidence that the State of Louisiana received federal assistance in excess of $10,000 annually. The Government would further establish, through documentary evidence and the testimony of

Page **1** of **13**

AUSA _J6_
Defendant _CK_
Defense Counsel

representatives of the St. Tammany Parish Sheriff's Office (STPSO), that the STPSO was an agency of St. Tammany Parish, a local government/municipality within the State of Louisiana that received federal assistance in excess of $10,000 annually.  STPSO was the chief law enforcement agency of St. Tammany Parish.  In that capacity, STPSO was responsible for, among other things, enforcing local and state laws, serving as the tax collector for St. Tammany Parish, and operating incarceration facilities for inmates, select pre-trial criminal defendants, and adjudicated offenders within St. Tammany Parish.  STPSO fell under the authority of the Sheriff, an elected official who was the chief law enforcement officer in St. Tammany Parish.  The Sheriff of STPSO had authority, among other things, to enter into certain contracts binding STPSO, including professional service contracts, unilaterally.  From about 1996 to June 2016, Public Official 1 was the Sheriff of STPSO.  As such, Public Official 1 was an agent of STPSO for purposes of Title 18, United States Code, Section 666.

The Government would further admit documentary evidence that in addition to their annual salary, STPSO provided a pension program for qualifying employees.  The pension program provided that employees' pensions vested after approximately twelve (12) years of service. Vested employees would receive approximately 3.33% of their salary for each year of service, for a maximum of 100 percent of an average of the highest three salary years.

The Government would further admit documentary evidence and eyewitness testimony that STPSO permitted employees to seek, obtain, and hold outside employment subject to certain restrictions.  Specifically, STPSO purported to adhere to the State of Louisiana Code of Governmental Ethics.  *See* La. Rev. Stat. § 42:1101-1170.  In pertinent part, an STPSO

Page **2** of **13**

AUSA *JG*
Defendant *CK*
Defense Counsel

employee was prohibited from "participat[ing] in a transaction in which he has a personal substantial economic interest of which he may be reasonably expected to know involving the governmental entity." *See* La. Rev. Stat. § 42:1112(a).

The Government would further admit documentary evidence and eyewitness testimony that **KEEN** knew Public Official 1 since **KEEN** was a child. Public Official 1 engaged in acts of sexual misconduct against **KEEN** beginning when **KEEN** was a child. **KEEN** was employed by the STPSO from about July 1997 to June 2016, most recently as a Captain. As a Captain, **KEEN** oversaw and supervised STPSO's Maintenance Department. **KEEN** understood that, because of the sexual misconduct, Public Official 1 was generous to **KEEN** in subsequent years, including hiring him at STPSO and providing him with the benefits detailed below, to keep **KEEN** in his inner circle and deter **KEEN** from talking about Public Official 1's sexual misconduct towards him.

The Government would further admit documentary evidence and eyewitness testimony that **David Hanson ("Hanson")** met Public Official 1 while they were both in grade school in Abita Springs, Louisiana. Thereafter, **Hanson** and Public Official 1 worked together in the Abita Springs Police Department. **Hanson** and Public Official 1 became friends and participated in numerous social activities with one another, including belonging to the same hunting club. **Hanson** was employed by STPSO from not later than 2008 to June 2016, most recently as a Captain. As a Captain, **Hanson** oversaw and supervised STPSO's Canine Division.

**Slidell Work Release Program**

The Government would further establish, through the introduction of documentary evidence and the testimony of representatives of STPSO, that STPSO was responsible for operating work release programs for qualified state and parish prisoners within St. Tammany Parish. The work release programs promoted public safety through the successful reintegration of rehabilitated individuals returning to the community after their incarceration. Participants focused on transitioning from incarceration, including finding and retaining employment, becoming productive members of the community, and reconnecting with family members. Inmates participating in work release programs often received specialized housing and the opportunity to work in non-custodial environments (*i.e.*, private employers) approved and obtained by the work release program.

The laws of the State of Louisiana provided that "[t]he sheriff of each parish . . . is hereby authorized to establish and administer a work release program for inmates of any jail or prison under his jurisdiction." *See* La. Rev. Stat. 15:711(a). Every inmate with work release privileges was liable for the cost of his room, board, clothing, and other "necessary expenses incident to his employment or placement." *See* La. Rev. Stat. 15:711(c). The wages of any inmate employed through a work release program were to be "collected by the sheriff or by his designated agent[.]" *See* La. Rev. Stat. 15:711(d).

Before about November 2007, STPSO operated a work release program in St. Tammany Parish, located at 141 Production Drive, Slidell, Louisiana 70460, within the Eastern District of Louisiana. In about 2007, Public Official 1 decided to open a second work force program in

AUSA _JG_
Defendant _CK_
Defense Counsel

Covington, Louisiana, which he chose to be operated by a private entity (the "Covington work release program"). Because work release programs were considered "professional services," the STPSO Sheriff had the authority to grant the right to operate work release programs to the private entity of his choice unilaterally. In about November 2007, Public Official 1 entered into a cooperative endeavor agreement with Company 1 to operate the Covington work release program without seeking competitive bids. From about January 2008 to about March 2014, Company 1 privately operated the Covington work release program. In about 2008, Public Official 1 arranged for Company 1 to hire **KEEN** on a part-time basis to work at the Covington work release program. From about 2008 to about 2014, **KEEN** was paid at least $30,000 per year for working at the Covington work release program. Public Official 1 instructed **KEEN** to give Public Official 1 approximately one-half of his net pay from Company 1 in cash.

The Government would further establish, through the introduction of documentary evidence and eyewitness testimony that in about early 2013, Public Official 1 decided to privatize the work release program located at 141 Production Drive, Slidell, Louisiana 70460 (the Slidell work release program). Thereafter, Public Official 1 discussed making **KEEN** and **Hanson** the joint owners and operators of the Slidell work release program. **KEEN** and **Hanson** understood that assuming ownership and control of the Slidell work release program would require them to resign from STPSO and, consequently, lose their salaries and pension increases from continued employment. **KEEN** and **Hanson** expressed this concern to Public Official 1. Thereafter, **KEEN**, **Hanson**, and Public Official 1 discussed ways to allow **KEEN** and **Hanson** to maintain their employment and still profit from the Slidell work release program. Ultimately, **KEEN**,

Page **5** of **13**

AUSA _JG_
Defendant _CK_
Defense Counsel

Hanson, and Public Official 1 agreed to make **KEEN**'s adult son (Person 1) and **Hanson's** adult daughter (Person 2), owners of the Slidell work release program. Because Person 1 and Person 2 lacked sufficient education, training, experience, or funding to own and operate the Slidell work release program, **KEEN**, **Hanson**, and Public Official 1 agreed that they needed to find another individual to serve as a partner and operator of the Slidell work release program and that Person 1 and Person 2 would serve as passive members in the Slidell work release program.

The Government would further establish, through the introduction of documentary evidence and eyewitness testimony, that in about early 2013, with the knowledge and approval of **KEEN** and Public Official 1, **Hanson** approached Person 3 about becoming involved in the ownership and operation of the Slidell work release program. **Hanson** presented Person 3 a series of conditions for his involvement in the Slidell work release program, including the following: Person 1 and Person 2 would each own forty-five (45) percent of the Slidell work release program and would each receive forty-five (45) percent of the profits, while Person 1 would own ten (10) percent, receive ten (10) percent of the profits, and receive a salary; and Person 3 would be responsible for the daily operations of the Slidell work release program. Person 3 was aware of **Hanson's** official position with STPSO and close relationship with Public Official 1. Person 3 knew that Public Official 1 was aware of the proposal and had authorized **Hanson** to convey it to Person 3. Person 3 further understood that the terms were non-negotiable. Person 3 further was aware that if he rejected the proposal he would be unable to compete for or obtain the contract. Ultimately, Person 3 agreed.

Page **6** of **13**

AUSA J.G
Defendant CK
Defense Counsel

The Government would further establish, through the introduction of documentary evidence, including records from financial institutions and the Louisiana Secretary of State, that St. Tammany Workforce Solutions, LLC was incorporated with the Louisiana Secretary of State on about March 23, 2013. The registered agent was Person 3, and its officers were Person 1, Person 2, and Person 3. Person 1, Person 2, and Person 3 entered into a legally binding operating agreement for St. Tammany Workforce Solutions, LLC on about May 1, 2013. Although Person 3 was to be responsible "for the daily operations and management of [St. Tammany Workforce Solutions, LLC] including the sole authority to hire and fire [its] employees," he enjoyed only a ten (10) percent ownership share, which entitled him to ten (10) percent of the profits. Person 1 and Person 2 each enjoyed a forty-five (45) percent ownership share of St. Tammany Workforce Solutions, LLC, which entitled each of them to a forty-five (45) percent share of all profits.

The Government would further admit, through the introduction of documentary evidence and eyewitness testimony that St. Tammany Workforce Solutions, LLC operated and controlled bank accounts at Citizens Bank & Trust Co. ("Citizens") bearing Accounts Nos. XXX1185 and XXX1223. **KEEN** operated and controlled a bank account at Home Bank, N.A. bearing Account No. XXXXX4958. Person 1 operated and controlled a bank account at Citizens bearing Account No. XXX9502. **KEEN** also enjoyed possession, control, and usage of a debit card drawn on Account No. XXX9502. Person 2 operated and controlled a bank account at Citizens bearing Account No. XXX9553. **Hanson** operated and controlled a bank account at Capital One Bank, N.A. bearing Account No. XXXXXX0573.

AUSA  JG
Defendant  CK
Defense Counsel

The Government would further establish, through the introduction of documentary evidence, that on about June 4, 2013, Public Official 1 entered into a cooperative endeavor agreement ("privatization agreement") on behalf of STPSO without seeking competitive bids with St. Tammany Workforce Solutions, LLC to operate the Slidell work release program. Public Official 1's privatization of the Slidell work release program constituted a formal exercise of government power and, as such, an official act. The agreement provided, in relevant part, that Public Official 1 would "lease to St. Tammany Workforce Solutions, LLC, the premises located at 141 Production Drive, Slidell, LA" from July 1, 2013, through July 1, 2016, that St. Tammany Workforce Solutions, LLC would "operate and manage" the work release program, and that St. Tammany Workforce Solutions, LLC would comply "with all federal, state, and local, laws, rules, and regulations, including but not limited to La. R. S. 15:711, fire code, health regulations, and DOC regulations."

The Government would further establish that the privatization agreement provided that STPSO would submit invoices to the Louisiana Department of Corrections for participants in the Slidell work release program. STPSO then remitted the amount paid by the Louisiana Department of Corrections to St. Tammany Workforce Solutions, LLC. According to the privatization agreement, St. Tammany Workforce Solutions, LLC would pay STPSO $3.50 per day, per inmate eligible to participate in the Slidell work release program and $1.50 per day, per inmate for all other offenders. St. Tammany Workforce Solutions, LLC also agreed to pay STPSO rent in the amount of $4,650.00 per month.

Page **8** of **13**

AUSA *JG*
Defendant *CK*
Defense Counsel

The Government would further establish through the introduction of documentary evidence that between about June 27, 2013, and July 1, 2013, Person 3 made a $10,000 loan to St. Tammany Workforce Solutions, LLC and pledged a piece of property he owned, appraised at $300,000, as collateral to obtain a $200,000 business loan for St. Tammany Workforce Solutions, LLC to be able to operate the Slidell work release program.

The Government would further establish through the introduction of documentary evidence that St. Tammany Workforce Solutions, LLC operated the Slidell work release program from about June 2013 through June 2016. During that period, Person 3 was responsible for the daily operations of the program. Neither Person 1 nor Person 2 participated substantially in the operation, oversight, or administration of the Slidell work release program. Typically, Person 1 and Person 2 only went to the Slidell work release program to retrieve their checks. The Slidell work release program, including its operation by St. Tammany Workforce Solutions, LLC, affected interstate commerce in multiple ways. St. Tammany Workforce Solutions, LLC purchased goods and services from outside the State of Louisiana, including by entering into food service contracts with vendors based in the State of Mississippi and the State of Texas. Additionally, inmate participants in the Slidell work release program worked for entities that were engaged in interstate commerce.

The Government would further establish, through the introduction of documentary evidence, including bank records, and eyewitness testimony, that Person 3 was directed to make other unnecessary financial expenditures after the agreement was executed. For example, Person 3 was required to pay Person 1 and Person 2 salaries in addition to their ownership disbursements,

AUSA *JG*
Defendant *CK*
Defense Counsel

even though they did not perform any work at the Slidell work release program. Additionally, **Hanson** directed Person 3 to hire Person 4 to work at the Slidell work release program. Person 4 was a relative of Public Official 1 and employee at STPSO. **Hanson** told Person 3 that Person 4 should be paid approximately $30,000 per year, approximately one-hundred (100) percent of Person 4's salary at STPSO. Because Person 3 understood Person 4's hiring to be directed by **Hanson** and Public Official 1, Person 3 hired Person 4 even though St. Tammany Workforce Solutions, LLC did not need to employ Person 4. Public Official 1 was aware of Person 4's hiring by the Slidell work release program.

The Government would further establish, through the introduction of documentary evidence and eyewitness testimony, that Person 3 understood that he was expected to pay Person 4, and Person 3 began paying him in about August 2013. Until about mid-2016, Person 4 was paid approximately $30,000 per year. Person 4 received the money even though he had no duties or responsibilities at, and performed no work for, the Slidell work release program. Public Official 1 knew that the job Person 4 was offered at the Slidell work release program and compensated for was a no-show job.

**Compensation**

The Government would further establish, through the introduction of documentary evidence and eyewitness testimony, that between about July 5, 2013, and January 13, 2017, Person 1 and Person 2 received not less than $1,195,000 from St. Tammany Workforce Solutions, LLC in the form of ownership disbursements, salary payments, and occasional lump sum miscellaneous

AUSA
Defendant
Defense Counsel

payments. Person 1 received no fewer than 145 payments totaling approximately $566,154.06 and Person 2 received no fewer than 131 payments totaling approximately $629,331.02.

The Government would further establish through the introduction of documentary evidence that, to advance, further, and carry out the scheme, payments to Person 1 and Person 2 typically took the form of checks drawn on one of the bank accounts under the control of St. Tammany Workforce Solutions, LLC or the personal bank account of Person 3. The depositing or cashing of these checks caused wire communications to travel in interstate commerce. For example, on about July 3, 2014, the deposit of check number 10337 in the amount of $15,000 drawn on St. Tammany Workforce Solutions LLC's Citizens bank account bearing number XXX1185 into Person 1's Citizens bank account bearing account number XXX9502 caused a wire communication to travel in interstate commerce. Similarly, on about November 7, 2014, the deposit of Check number 10455 in the amount of $15,000 drawn on St. Tammany Workforce Solutions LLC's Citizens bank account bearing number XXX1185 into Person 2's Citizens bank account bearing account number XXX9553 and cash withdrawal caused a wire communication to travel in interstate commerce.

The Government would further establish, through the introduction of documentary evidence and eyewitness testimony, that Person 1 and Person 2 transferred a significant portion of the profits received from St. Tammany Workforce Solutions, LLC to their fathers, **KEEN** and **Hanson**, respectively. They did so in one of several ways. For example, on approximately 276 instances, Person 1 generated cash from payments made by St. Tammany Workforce Solutions, LLC and Person 3 totaling approximately $291,485.81, some of which he then gave to **KEEN**.

Page **11** of **13**

AUSA _JG_
Defendant _CK_
Defense Counsel ___

Additionally, **KEEN** regularly used a debit card drawn on the funds in Person 1's bank account to pay for his personal expenses. On approximately 167 instances, Person 2 generated cash from payments made by St. Tammany Workforce Solutions, LLC and Person 3 totaling approximately $436,091.31, a significant portion of which she either gave to **Hanson** or deposited into bank accounts to be used for the benefit of **Hanson**. The depositing of funds from Person 2 into a different bank account to be used for **Hanson's** benefit and **KEEN's** usage of the debit card drawn on funds in Person 1's bank account caused wire communications to travel in interstate commerce.

**Payments to Public Official 1**

The Government would further establish, through the introduction of eyewitness testimony, that **KEEN** and **Hanson** both understood that they would provide Public Official 1 financial compensation in exchange for bestowing the right to operate the Slidell work release program on St. Tammany Workforce Solutions, LLC. This understanding was based, in part, on Public Official 1's conduct in arranging for Company 1 to hire **KEEN** in about 2008. Thereafter, **KEEN** and **Hanson** discussed the need to give Public Official 1 a portion of the profits of St. Tammany Workforce Solutions, LLC and the amount they needed to give him. For example, on multiple occasions **KEEN** and **Hanson**, and by extension Person 1 and Person 2, gave Public Official 1 a portion of the payments they received from St. Tammany Workforce Solutions, LLC. **KEEN** and **Hanson** each did so by making payments of not less than $1,000 in cash to Public Official 1 on a recurring basis, and they typically made the payments at Public Official 1's residence. Additionally, in about January 2015, **Hanson** told Person 2 to write Public Official 1's son a $4,000 check, which **Hanson** then gave to Public Official 1's son. Person 2 gave such

AUSA JG
Defendant CK
Defense Counsel

a large amount of money to Public Official 1's son because Public Official 1 issued the right to operate the Slidell work release program to St. Tammany Workforce Solutions, LLC. The privatization agreement did not reflect, and thereby did conceal, the fact that Public Official 1 would receive financial compensation in exchange for bestowing the right to operate the Slidell work release program on St. Tammany Workforce Solutions LLC.

The above facts come from an investigation conducted by, and would be proven at trial by credible testimony from, Special Agents from the Federal Bureau of Investigation (FBI) and Internal Revenue Service – Criminal Investigation Division (IRS-CID), other witnesses, and documents and electronic devices in the possession of the FBI and IRS-CID, and statements made by the defendant, **CLIFFORD "SKIP" KEEN**. The evidence contained herein constitutes a minimum statement of facts detailed for the limited purpose of demonstrating a sufficient legal basis for the plea of guilty exists. It is not intended to constitute a complete statement of all facts known by **KEEN** or developed during the course of the investigation.

APPROVED AND ACCEPTED:

_____
CLIFFORD "SKIP" KEEN
Defendant

_____
KEITH COUTURE
Attorney for Defendant Keen
Bar Roll No. 22759

_____
JORDAN GINSBERG
Assistant United States Attorney
Illinois Bar Roll No. 6282956

_____
ELIZABETH PRIVITERA
Assistant United States Attorney
Louisiana Bar Roll No. 27042